We're ready for the first case, which is 23-7044, United States v. Woodmore. Counsel for appellant, if you would make your appearance and proceed, please. Good morning, Your Honors. My name is John Campbell. I am counsel for the defendant appellant, Calvin James Woodmore. If it pleases the court, I would like to begin my discussion with the two jury instructions that I identified in my briefing. The first one was a jury instruction where the court instructed the jury that an attorney may have the right to interview witnesses. And then there was a second part to that instruction as well, and I'll offer my comments in two parts. With respect to this first part about whether an attorney has a right to interview a witness, I would submit that that's just not the case, particularly with respect to defense counsel. I'm not aware of any natural right that I might have to talk to a witness, any statutory right that I might have to talk to a witness, or any contractual right or otherwise that I might have to talk to a witness. Do you have any law that says you don't have to talk to a witness? That I don't have to talk to a witness? Yeah, or that you can talk? Is there any case law out there on that? Well, Your Honor, a witness doesn't have to talk to me. I can approach them. No, that's not my question. Have you got any case law that says that's prohibited? I mean, other than the fact that a witness doesn't have to talk to me, I can't compel a witness in a criminal case to talk to me. No. I can ask them to talk to me, but they don't have to. Is that contrary to any other situation, whether it be civil or not? You can always subpoena, but a witness can always say, I'm not talking to you. Or a witness can say, yeah, I'll be happy to visit you. In a civil case, Your Honor, the witness can be subpoenaed in for a deposition, and then they have to talk to me unless they have some privilege that allows them to not answer a question. With the case of the government in a criminal case, particularly in these conspiracy cases, oftentimes many of the witnesses who aren't agents for the government are co-defendants, and they have cooperation agreements, and they have a contractual obligation to talk to the United States, or else they have violated the terms and conditions of their cooperation agreement. So the way this instruction is written just simply isn't correct. I have no right to talk to these witnesses, and they have a contractual obligation to talk to the United States. I struggle to understand why that's so. You have a right to talk. They don't have to talk to you. I mean, just as when I'm walking down the street and I want to say hello to somebody and they don't want to talk to me, I have a right to talk to them. I have a right to say, hey, do you want to go to lunch? They don't have to go with me. I mean, I don't – it seems to me that the whole – the way you're interpreting this, as I see it, is that the instruction says witnesses are obligated to talk to the defense. Well, of course they are not, but you have a right to seek to talk to them. They may not want to talk to you. What am I missing here? What in this instruction suggests that – suggests that somehow or other you are – they have – that they have an obligation to engage in an intercourse with you, and that is wrong. I admit that's clearly wrong. But what is wrong with this? Well, what's wrong with it is they – I do not have a right to talk to these people. Why don't you have a right to talk to them? You can go up to a witness and say, I want to talk to you. Will you talk to me? And they say no. Well, first of all, most of them are represented by counsel. Okay. So I can't do that. I can contact their lawyer. Yes, you can. And ask if the lawyer will allow me to talk to them. But the way this instruction is written, it implies that there's going to be communication between the two of us, like is the case with the United States where they have a cooperation agreement and they actually sit down with the United States and discuss what their testimony is going to be on the day of trial because they're cooperators. They have a contractual obligation to communicate with the United States. And a big part of my case was pointing this out to the jury. And then we get to the instruction point, and the court tells them that both parties could have talked to them, which simply is not true, and that they're not to draw a negative inference from the fact the United States did talk to them. What is the standard that we evaluate the court's choice of giving this instruction? What is the standard of review for that? Your Honor, I believe it's abuse of discretion. All right. Well, what is arbitrary or a matter of legal error from the court saying that you can try to speak to a witness? Let me back up. Let's assume there are two plausible interpretations here, one, the interpretation you have, and then one being the interpretation that you can seek to contact through counsel a witness, and if the witness doesn't want to talk to you, the witness doesn't have to talk to you. And under that interpretation of this, if there are those two competing interpretations, how could we find that the court abused its discretion by giving this instruction? Well, this implies that defense counsel and the United States are on equal footing. I'm sorry. You didn't answer my question. If there are two plausible interpretations of this instruction, how could we find that the district court abused its discretion in choosing its interpretation and therefore giving the instruction? The way this instruction is written, it puts a finger on the scale for the United States, Your Honor. I'm sorry. I'm waiting for the answer. If there are two plausible interpretations, you can tell me that the interpretation I'm offering is not plausible and is therefore not one that could be gleaned from the plain text of that instruction. But if it is a plausible interpretation and you have yours and I'm offering another, how can we find that the district court abused its discretion by choosing not yours? I guess I just don't understand your question, Your Honor. Well, let's try it this way. There are two plausible interpretations of one instruction. What I'm saying is if the district court chooses A and you say it means B and they're both plausible, under the standard of review, how can we hold that the district court abused its discretion by choosing A? I just find the A interpretation to be an unreasonable interpretation of this instruction, Your Honor. How do you get around United States v. John, which basically said the instruction was okay?  Your Honor, I don't believe it's a correct statement of what the law is, Your Honor. But we are bound by it. One panel cannot overturn another panel's decision. I don't know how to answer that, Your Honor. You have to get it unbunked. Yes, Your Honor. With respect to the second half of this instruction, it says that the fact that a witness has talked to an attorney should not by itself reflect adversely on the truth of the testimony of the witness. I would submit that the jury should be allowed to evaluate whether or not this created any sort of bias in the witness, just like it would evaluate any other act of bias. And the second half of this instruction seems to tell the jury that they can't draw any negative inference from the fact that an attorney has talked to a witness. Whereas I think the jury should be allowed to evaluate that like they would evaluate any other issue of bias. The second jury instruction that was discussed in the briefing deals with whether or not a definition of methamphetamine actual should have been provided to the jury. The term methamphetamine actual is used in the instructions when it's defining what the elements of the crime are, although it never defines what methamphetamine actual. But then when you get to the actual verdict form, it doesn't use the term methamphetamine actual anywhere. And it doesn't define what methamphetamine versus methamphetamine actual is for the jury. So this is the verdict form, which is at page 383 in the pleadings for the record on appeal. The jury is asked to determine whether there's 50 grams or more or 5, but less than 50 grams and less than 5 grams of methamphetamine in this case. So, which varies from the term methamphetamine actual, which is used earlier in the instructions. So it's unclear to me whether the jury just tabulated up methamphetamine that they thought was attributable to my client or whether or not they made any judgment as to whether or not this was methamphetamine actual. Wasn't there some testimony that the methane in this case was pure? Well, certainly there was some that was tested. There were two theories offered by the government with respect to my client. There was a package that was intercepted that was very pure methamphetamine. But there was also a number of packages that were sent to my client's girlfriend or wife's house while he was in jail. Eleven packages were sent. None of that methamphetamine was tested. And so, I don't know if the jury is considering that methamphetamine as attributable to my client or if they believed that the methamphetamine that was intercepted and tested is attributable to my client. But they were never instructed in how to ascertain whether or not something was just a mixture in substance containing methamphetamine or methamphetamine actual. And then in the actual verdict form, all they're asked is whether or not there was 50 grams or more of methamphetamine with no use of the term methamphetamine actual. Did you object to the verdict form? Or you haven't challenged the verdict form on appeal, have you? I objected to, in the, at trial, I objected both to the instruction and to the verdict form that it didn't include a definition for what methamphetamine actual was. What have you done on appeal as it relates to the verdict form? I don't recall there being any challenge to the verdict form on appeal. Well, on appeal, I asked, I objected to the fact there wasn't a definition for the term methamphetamine actual included with a packet of jury instructions. And I guess that the thrust of your argument, as I understood it, was, at least in part, that there is a confusion created for the jury by the fact that the indictment refers to methamphetamine actual. And then when they get to the verdict form, there is no reference to actual at all. And leading the jury, the jury could therefore come up with any version of methamphetamine to hold your client responsible. Did I understand that correctly? Yes, Your Honor, that's correct. Okay, well, then the harm comes in part from, at least as it relates to that, comes from the verdict form. The fact that the verdict form does not include a reference to actual. And such that it would align with, at least we know we're talking about the same thing, which is what I understood you to be saying, and you aren't challenging on appeal the verdict form. I understand what you're saying, Your Honor. Okay. I'll reserve the balance of my time for rebuttal, if the Court allows. May it please the Court, Counsel, I'm James Braun on behalf of the United States. The defendant has raised three issues on appeal. And unless the Court has questions about a particular issue, I plan to go through each in order, at least the ones that Mr. Campbell covered during his presentation. I do have a question, Mr. Braun. And I'm not really clear why there wouldn't be a definitional instruction as it relates to methamphetamine actual. The response that one might offer is that it's common sense and everybody knows what actual is. In the narcotics arena, I'm not sure that's right. And more to the point, the sentencing guidelines don't think it's right because they define what methamphetamine actual is. So why shouldn't we have an instruction here? Why would the jury know when it sees in the indictment actual what actual means? Well, two parts to that answer, Your Honor. First, starting with the sentencing guidelines. The guidelines define the term methamphetamine actual because they deal with methamphetamine differently than the statute does. The statute uses the word methamphetamine to mean actual methamphetamine. As opposed to a mixture of substances. Exactly right. Well, the guideline definition, it seemed to me, was very much along the same lines. In fact, the guideline definition was very similar to the instruction that he presented. The guidelines, though, when they talk about methamphetamine, when they use the word just methamphetamine, it means mixture in substance. So it's the opposite of the statute. And so when they use the term methamphetamine actual, that's something that's not in the statute. And the term methamphetamine in the guidelines is the opposite of the statute because that does mean mixture in substance. So there it makes sense to define it because they're using the word differently than the statute does. And when the term is used in the statute, absent, you're saying absent, the reference to actual, the term means pure methamphetamine. Exactly. It means actual. Well, why would you use the term actual then in the indictment if it didn't matter, if it didn't matter for purposes of the statute? Because when the jury looks at the indictment, it sees the word actual and it says, hmm, what does that mean? And where does it find out what that means? Right. And I think the word actual is in there because of the fact that it's used in the sentencing guidelines. And to mean pure methamphetamine, the amount of pure methamphetamine in a given sample. I got it. But if there's harm here, the harm comes from jury confusion. And the jury would, why wouldn't the jury be confused if it has a term in there? Well, I mean, you think it's important enough to put in because that's what the guidelines have. Well, if the jury looks at that word, what gives it content? So going back to basics, as far as the point that a district court's decision to give or not to give a jury instruction is reviewed for abuse of discretion. And in reviewing the district court's exercise of its discretion in this case, this court should really look at that decision in the context of the whole case. And here, the context is not one relatively small amount of methamphetamine that's impure, where the parties really are fighting over is the actual amount over that 50 gram threshold. Here, the smallest sample was 54 grams of 98 percent pure methamphetamine. That's the sample that was purchased from Early Woodmore, and I believe it was November of 2018. That's the smallest sample, and it's over the 50 gram threshold. But then on top of that, we have the pound, the 440 grams that was seized in August of 2019 straight out of the mail. And that was 99 percent pure. Well, 10 times the 50 gram threshold, almost 500 grams. And then on top of that, we have the substantial testimony from Noel, Kimberly Noel, the source of supply, that she would send this methamphetamine, this high-quality methamphetamine, one to two times, well, every one to two weeks, a pound for a year. So we're dealing with pound on pound of high-quality methamphetamine, and we have a sample to compare it to to know what, when we talk pure, we're talking 99 percent pure. We're so far above that 50 gram threshold that it was entirely reasonable for the district judge, in this context, to decide that it would not be helpful to the jury to try to define methamphetamine actual, because no reasonable jury could find that there wasn't more than 50 grams of methamphetamine actual here. Setting aside the obvious question of whether the defendant is guilty of participating in the conspiracy or not, that's not what this case came down to, whether we're talking about 50 grams or more of actual methamphetamine. The amount that was seized, the amount that was testified to, so far exceeded that threshold that the judge concluded it simply wouldn't be helpful. And that makes sense when you look at the John case, where even the court in that case said, we don't recommend this instruction, we find that it wasn't really helpful, but it concluded that it wasn't confusing in the context of the case. Counsel, let me ask you, and you can help me out. And I'm sorry, I think that was the Harwell case, not the John case. On the methamphetamine that was mailed to the home, as I recall, you put on testimony as to the actual, we're using the word, the quantity as far as its purity is concerned. And then the other part of it was mailed where to? It was mailed to his home, and where was the other mail for him? I can't remember. It was mailed to multiple residences, including, I believe, 11 packages to the defendant's residence. Did you put on the testimony, though, that proved the purity of that testimony? I know you did on the home, but I don't recall you doing that in regards to the other places that it was mailed. Well, there were only two samples that were seized, Your Honor. The one that was purchased from Early Woodmore in November of 2018, that was tested, and the purity was determined 98 percent pure. And then the sample that was seized that was being shipped to the new address, the hotel address in Arkansas, in August of 2018. And, of course, that was seized, it was tested, and the purity was determined to be 99 percent pure. None of the other samples were seized, the other packages. They were testified to by Noel and some of the law enforcement witnesses who were observing things happening but didn't actually seize the packages. So we didn't have those to determine a purity, but we do have that one seized sample, and that's really all that matters. Noel testified to what she would send. She didn't testify that one package was any different than another, and the one that we seized was 98 percent pure. Oh, did you say the packages were, in fact, the same kind of meth? In other words, as opposed to saying that there's no testimony it was different, was there testimony it was the same? No, I don't think there was any specific testimony as to that. But there was testimony that this was a good source of supply, that she provided good methamphetamine. And so I think the idea was it was consistent, that it was high quality, and the seized samples certainly corroborated that it was high quality. They were in the same 90s, high 90s range? Exactly. Okay. Could I shift a topic here to the question, to the sufficiency of the evidence as it relates to the money laundering and the money laundering conspiracy? Of course. If I could just make a quick correction, it was Viegas, the case that dealt with the methamphetamine actual jury instruction. I appreciate precision. Precision's a good thing. Let me, I'm going to ask you some questions to understand, make sure I understand the record, okay? And just, you can just tell me yes or no if it fits, okay? Yes. As I understand it, there is no evidence that the defendant did more than one transaction of $2,000. That is correct. Okay. There is no evidence as to the source and the money for the $2,000? I would dispute that, no direct evidence. There is circumstantial evidence that the defendant did not have any other legitimate source of income and that early didn't either for the relevant time period. And so that is circumstantial evidence that this was the proceeds of drug trafficking because there was substantial evidence that he was involved in drug trafficking, in a lucrative drug trafficking organization. But no, there was no direct evidence saying this money was from selling drugs and it was, he tried to transfer that money. And so the idea in your response to that question, the notion would be neither early nor the defendant had legitimate sources of income, therefore the money could have only come from drug trafficking. That's right. Especially when it's in the context of the other testimony that that's how this organization worked. They had to get the money from Oklahoma to California. And the way they did that was through wire transfers. And Noel testified that she only talked with early or later after he went to jail with Amber about the drugs, the drug shipments, and the money being transferred back. So the reasonable inference is that when someone else would transfer money, it was at early's direction or his request. Well, maybe. Let me just finish my list here. Yes, sir. There's no evidence, and I understand your qualification on the other point. No evidence the defendant discussed money laundering with early or anybody else. No, except for the circumstantial evidence that Noel did testify that she only talked to early. And so the inference is that if the defendant is then transferring money, it's at early's request. Okay. Well, there's no evidence of directions from early about this specific transfer, is there? No, except for the circumstantial evidence. Okay. And this particular $2,000, there's no evidence really. What is the evidence that this was in furtherance of drug trafficking except for the fact that there was a drug trafficking conspiracy underway? And I want to be specific about this point. Early was involved in a luxury goods enterprise with Noel, right? I mean, the point was that she would send him luxury goods and he would send her money. That's right. Okay. Well, and there was no allegation that that was the lawful in itself, right? No. I would hesitate to call it an enterprise because I don't believe that there was any evidence that early was then selling the goods or doing anything like that. He was purchasing goods that Noel would receive for next to nothing. Okay. He purchased goods. Right. And he sent her money through wire transfers for those goods. That is right. Okay. And was there any suggestion that there was – that that activity was intricately involved with the drug trafficking such that if he stopped buying the luxury goods that – I mean, if he stopped the drug trafficking enterprise, that those two things were so connected that one hinged on the other. I'll phrase it that way. There was no direct evidence of that. Okay. But there was evidence from – I believe it was – and I hesitate to say the witness. There was evidence from a witness testimony as far as what was Noel's cut, what was the arrangement for her cut. And it wasn't just $500 for each shipment. It was help paying bills and cars and things like that. And so this would fall in the things like that category of Noel's understanding of what her cut would be is that Early would send her money in addition to the $500 that she received for each shipment. And so in that context and, again, with the jury free to make reasonable inferences, the reasonable inference is that they needed to keep Noel happy. And that meant buying luxury goods that she received for next to nothing. Okay. Well, all right. I get that point. But was there any – beyond this inference that you are asserting is reasonable, there's no suggestion that that was some sort of explicit arrangement they had. He bought luxury goods from Noel, right? He did, yes. Okay. And let me just posit a hypothetical for you. If, in fact, Early gives money to the defendant, $2,000, to transfer to Noel, doesn't tell him what it's for, we don't know that this money was for luxury goods or for drugs, at that point – and the defendant turns around and sends it. Tell me why that is a conspiracy, mind you. And I'm talking mens rea now. Give me mens rea. Tell me why that is a conspiracy to engage in money laundering and why that, in fact, is money laundering. Okay. So the defendant was part of a conspiracy that wasn't just him and Early. It wasn't just a cast of two characters. It was a cast of many characters. There were two conspiracies. There's a drug conspiracy and there's a money laundering conspiracy. I'm not questioning his involvement in the drug conspiracy. I want to know, based upon that hypothetical, why that is money laundering conspiracy and why his intent would have been consistent with money laundering conspiracy. Right. And even the money laundering conspiracy had multiple members because that's how this organization worked. There was the drug conspiracy where they were getting drugs from California and selling it, the money laundering conspiracy where they would take the proceeds from that drug trafficking activity, which was substantial. When you're talking about 20 to 30 pounds of methamphetamine over the course of that year or two years, 2017 to basically 2019, that's a substantial amount of income that's generated from that. They have to get that back to California. The way they did that in the testimony was that Early would have people. I see I'm out of time. If I could finish my answer. I definitely want you to finish. Thank you. And no, I'm not questioning that money was being transferred back as part of the drug trafficking conspiracy. There's only one allegation in this complaint that's of action that supports the money laundering conspiracy. And that's the two thousand dollar transfer. So I gave you the hypothetical and I'm asking you why that is enough for money laundering conspiracy tied to the mens rea of that crime and why that's enough for substantive money laundering. So that's the overall conspiracy. And there was substantial evidence of that, that multiple people would transfer money at Early's request to Noel or Noel's designee in furtherance of the drug trafficking conspiracy. Now, as far as this defendant in particular, so that establishes the conspiracy. Now, as far as his participation in the conspiracy, again, Noel testified that she only talked with Early and then later with Amber about the money being transferred. And so that indicates that she said she would have talked to Early about this two thousand dollars. That means that he had to tell direct a request that the defendant try to transfer that two thousand dollars. Now, there was the evidence that the only legitimate or there was no legitimate income, that the only income was from drug trafficking. So that's drug trafficking proceeds that the defendant is transferring to Noel. The reasonable inference from that is that it's to pay Noel for the drugs because that's why not luxury goods or the luxury goods in furtherance of the conspiracy to keep the source of supply. And that that's based on some inference that they had to keep her happy and therefore they were buying luxury goods. That's right. All right. And yes, it's circumstantial evidence. It's based on what we submit as reasonable inferences. But that's for the jury. There was the actual evidence of the drug trafficking, of the money transfers, of the lack of legitimate income. And the jury was entitled to make reasonable inferences from that evidence to determine that this defendant, when he tried to transfer that two thousand dollars, was doing it with the proceeds of drug trafficking to further and promote the drug trafficking conspiracy by either paying for methamphetamine or keeping their source of supply happy. Where does the mens rea fit into this? I mean, he's not, the defendant's not an automaton. I mean, he's given the money. We've got to prove that he, in fact, had the mens rea of engaging in this conspiracy to engage in money laundering. Assuming that Early hands him the money, let's assume for the moment that it is drug proceeds. Early hands him the money, doesn't tell him where the money comes from, just tells him send it to Noel. Is that enough for money laundering conspiracy? We believe in the context of this case where the defendant is, it's not like the defendant has no involvement in the drug trafficking conspiracy and he's just given this money. He's intimately involved with the drug trafficking conspiracy. He knows where Early gets his money. He knows where he gets his money. So, again, especially when you're talking about mens rea, we rarely have direct evidence of mens rea. We have to rely on circumstantial evidence. And the circumstantial evidence here is that being involved in the drug trafficking conspiracy, knowing where Early gets his money, knowing that you have to pay your source of supply for the drugs you're getting, that that would indicate that he knew what he was doing, that he knew this was the proceeds of drug trafficking and that he knew that he was doing it to promote the drug trafficking conspiracy or the money laundering conspiracy and the drug trafficking conspiracy. Thank you, counsel. And thank you to my colleagues for indulging me and pursuing that. If you'll round him up to two minutes and then we'll, you don't have to take it all. Thank you, Your Honor. I just want to point out the counsel made the argument that Calvin Woodmore did not have any other sources of income. That's not supported by the record. There was evidence in the record that Calvin Woodmore and Early Woodmore had a horse business. Now, granted, there was a witness, Ashley Miller, who testified that they did not make much money from that business, but there's no qualification as to what not much money means, and that can vary pretty dramatically from person to person. You could still not make much money and still make thousands and tens of thousands of dollars a year. So to say that they didn't have any other sources of income I don't think is correct. They did have some legitimate income with this horse business, training horses or boarding horses or whatever that may be. And that is acknowledged in the United States reply brief on page 26. And that's all I have, Your Honor. Thank you, counsel. Case is submitted. Thank you for the argument.